227 F.2d 607
 A. J. JACKSON, as Trustee in Bankruptcy of Dale R. Peterson & Co., Inc., Appellant,
v.
E. Firmin FLOHR, Edward W. Flohr, and L. Carlos Flohr, doing business as Flohr & Co., Metal Fabricators, Appellees.
 No. 14293.
 United States Court of Appeals Ninth Circuit.
 June 23, 1955.
 Rehearing Denied September 26, 1955.
 Writ of Certiorari Denied January 16, 1956.
 
 See 76 S.Ct. 322.
 Willard Hatch, Arthur S. Quigley, Croson, Johnson & Wheelon, Seattle, Wash., for appellant.
 Holman, Mickelwait, Marion, Black & Perkins, Lucien F. Marion, William M. Holman, Seattle, Wash., for appellees.
 Before BONE, FEE and CHAMBERS, Circuit Judges.
 JAMES ALGER FEE, Circuit Judge.
 
 
 1
 Jackson, Trustee for Dale R. Peterson & Co., Inc., a bankrupt building contractor, sought in this cause in a United States District Court to recover under Washington statutes moneys previously received by the Flohrs, metal fabricators and subcontractors, who had furnished labor and materials on two jobs for which the Peterson company was the general contractor.
 
 
 2
 The Trustee chose to ground his attack upon the Flohrs under 11 U.S.C.A. § 110, sub. e(1), which gives a trustee the right to recover any money transferred under circumstance which rendered the transaction voidable by state law.[1] The Trustee, having a choice of forum, filed this action in federal rather than state court.
 
 
 3
 Specifically, the Trustee sought $2,424.50, received by the Flohrs on account of Peterson's "Williamson job," and $730.00, on account of the "Joe Favre job," before the adjudication of bankruptcy of Peterson company. The particular statute of the State of Washington relied upon is found in Sections 23.48.010(1) and (3) and 23.48.030 of Remington Code of Washington, which read as follows:
 
 
 4
 R.C.W. 23.48.010(1). "`Receiver' means any receiver, trustee, common law assignee, or other liquidating officer of an insolvent corporation".
 
 
 5
 R.C.W. 23.48.010(3). "`Preference' means a judgment procured or suffered against itself by an insolvent corporation or a transfer of any of the property of such corporation, the effect of the enforcement of which at the time it was procured, suffered, or made, would be to enable any one of the creditors of such corporation to obtain a greater percentage of his debt than any other creditor of the same class."
 
 
 6
 R.C.W. 23.48.030. "Any preference made or suffered within four months before the date of application for the appointment of a receiver may be avoided and the property or its value recovered by the receiver. No preferences made or suffered prior to such four months period may be recovered, and all provisions of law or of the trust fund doctrine permitting recovery of any preference made beyond the four months period are hereby specifically superseded."
 
 
 7
 On May 16, 1952, Peterson company suffered the appointment of a receiver in a Washington state court. (This fixes the critical date for preferences here as January 16, 1952.) Subsequently, on June 18, 1952, a petition in involuntary bankruptcy was filed against the company, and on July 24, 1952, adjudication of bankruptcy was made. Finally, Jackson was appointed Trustee on August 21, 1952.
 
 
 8
 A recital of facts apparently assumed by the trial court in entering summary judgment against the Trustee on each claim follows. Both payments to Flohrs occurred after January 16, 1952. The Favre payment of $730.00 was made by Peterson company itself direct to Flohrs. The Williamson payment was made by a check in the amount of $2,424.50, drawn by Williamson, the owner, which was payable to Peterson company and Flohrs jointly. After securing the endorsement of Peterson, Flohrs cashed the check. A critical fact as to both payments is that, under the Washington statutes, Flohrs, as subcontractors, had a material-men's lien against Williamson and Favre properties, respectively. The necessary five days' notice to charge each of these properties before commencement of work had been given. The 90 day period after completion for perfecting the lien had not expired in either instance. Peterson delivered the last materials to the Williamson property on December 26, 1951, and to the Favre property on November 12, 1951.
 
 
 9
 The trial court said these payments were not preferences. 119 F.Supp. 305. Whether or not this solution was correct must necessarily depend upon Washington law because that is the source of the right plaintiff asserts.[2] Both parties place reliance upon the case of Seattle Association of Credit Men v. Daniels, 15 Wash.2d 393, 130 P.2d 892. If that case were identical, our task would be easy, but, of course, if this case were the same, the parties would not be here.
 
 
 10
 A thorough examination of the Daniels case and all Washington authorities does not bring forth any case that is conclusive of our question. Naturally, any determination here made evaporates as soon as the Washington courts announce a decision of the precise point upon which we are called to rule. We are aided in our determination by the expressions of the Washington courts, so it cannot be said that we plow virgin soil and need pay no attention to what Washington has said. We must try to conclude what the Washington Supreme Court would do here in the light of its decisions.
 
 
 11
 Therefore, the discussion which follows is bottomed upon our reading of the Daniels case, as well as we can read it, and an examination of all Washington cases that seem apropos. Making due allowance for various changes in the Washington statutes, we have been strongly influenced by the underlying principles discussed in State v. Williams, 133 Wash. 121, 233 P. 285; Spokane Manufacturing & Lumber Co. v. McChesney, 1 Wash. 609, 21 P. 198; Simpson v. Sisters of Charity of House of Providence, 108 Wash. 82, 182 P. 937; Whiting v. Rubinstein, 7 Wash.2d 204, 109 P.2d 312; Terhune v. Weise, 132 Wash. 208, 231 P. 954, 38 A.L.R. 94; Seattle Association of Credit Men v. Luster, 37 Wash.2d 192, 222 P.2d 843, and Northwest Hardware Co. v. M. & S. Logging Co., 132 Wash. 413, 232 P. 274.
 
 
 12
 As to the Williamson payment, we uphold the determination of the trial court thereon.
 
 
 13
 The construction of the federal Bankruptcy Act is not involved except insofar as the statutes of the State of Washington are thereby adopted as the criteria of avoidable transfers. As this Court understand the facts, there was no transfer made and no lien in existence within the federal penumbra of bankruptcy. There was no allegation or attempt to prove that the Flohrs, at the time these payments were received by them, "had reasonable cause to believe the bankrupt insolvent." See 11 U.S.C.A. § 96. The sole question then was whether these two separate payments were denounced by the law of the state. There are three statutes of Washington which must be scrutinized: (1) the act as to avoidable preferences;[3] (2) the lien laws;[4] and (3) the enactments which constitute the contractor an agent for the owner.[5] The burden was on the Trustee in each instance.
 
 
 14
 Under R.C.W. 23.48.010, a "transfer of any of the property of such corporation" is denounced. Here none of the property of Peterson company was transferred. The money belonged to Williamson, the owner. The lien was on the realty of Williamson. Irrespective of the validity of the lien, his intention to prevent a cloud on his title is clear. The money was his. Williamson had a right to direct the application thereof.[6] If the money had been paid direct from Williamson to the Flohrs, the contractor would have had no claim against the owner for this sum.[7] He could have used one of the officers of Peterson company as a messenger to carry the cold cash to the Flohrs.[8] The mere endorsement of the check did not pass the fund in the estate of Peterson company.[9] The making of the check to Peterson and the Flohrs jointly was simply to furnish evidence that the contractor knew of and acquiesced in the payment. The endorsement by Peterson company is evidence that the contractor also intended that Williamson's money should go to the Flohrs. The Trustee did not so prove that "any of the property of the corporation was transferred."
 
 
 15
 The lien statutes of Washington make it clear there was a valid encumbrance upon the property of Williamson at the time of the payment.[10] Mechanics' liens are provided by statute in order to give the furnisher of labor and material, security against the realty so that it is unnecessary to rely upon the personal responsibility of the contractor. The Washington law contains an express declaration that the underlying policy shall be carried out by construction in the courts.[11] Also, it is specifically provided that the lien attaches upon the furnishing of the first labor or material.[12] True, the lien can be cut off by condition subsequent: (1) if there is a failure to give the five day notice to the owner,[13] (2) if the lien notice is not filed within ninety days after completion of furnishing,[14] and (3) if action is not commenced at the time specified.[15] Neglect to take appropriate action within any one of these time periods avoids the lien. On the contrary, the lien is in full force and effect as soon as the material is furnished.[16] It encumbers the property without doubt for five days and thereafter unless it is cut off by a failure to give the notice to the owner within the statutory time. And, if notice has been so given, the lien is perfect. It may be cut off by failure to file written notice according to law within ninety days after completion of the work. If this notice is then filed, the lien can still be outlawed if action is not commenced as provided.
 
 
 16
 Now the Washington "preference" statute provides "the effect of the enforcement" of the transfer "at the time it was" made would enable a creditor to obtain a greater percentage "than any other creditor of the same class." There are two noticeable prerequisites here which do not exist in the payment of the lien by Williamson, even if it were assumed contrary to fact that the fund entered the estate of the debtor: first, "at the time" the transfer was made, there was a valid and existing lien and it could probably have been discharged by the contractor with his own money without creating a preference; and, second, a creditor holding a lien upon the property upon which the contractor is working and which, of course, he must turn over free and clear of liens is not in the same class as any other creditor of the contractor.
 
 
 17
 It seems implicit in the argument of appellants that, if there were a contract or agreement between the owner and contractor that the money would be paid to the Flohrs, then a preference would not result because it would be held by Peterson company in trust, if it be assumed Peterson got actual legal title to the money. But it is obvious, if Williamson sent the money to Peterson with the express direction to pay it to the Flohrs in satisfaction of the lien, that Peterson would be the trustee of an express trust. In this instance, no such direction was necessary. It is clear Williamson was not paying a contractor and taking a chance that the Flohrs would file a lien in due course, as they would have done.
 
 
 18
 The statutes of Washington supply the place of a contract or express direction. The contractor is clearly made the agent of the owner in relation to the lien. It provides "every contractor * * * shall be held to be the agent of the owner". R.C.W. 60.04.010. Another enactment expressly provides that, under these circumstances, a contractor shall be deemed to have received money paid as this was for the purpose of paying all claims for labor and material supplied "as the agent" of the person with whom the contract was made. R.C.W. 9.54.080. The Supreme Court has upheld a conviction of a contractor who misappropriated money under a sister statute. R.C.W. 9.54.010. State v. Williams, 133 Wash. 121, 233 P. 285.[17] Another act provides that the contractor is only entitled to money after claims for material and labor have been paid, and permits the owner to withhold from the contractor the money to pay such claims where an action has been filed thereon. R.C.W. 60.04.110.
 
 
 19
 The texture of the state statutory law[18] is such that there seems little doubt about interpretation. Furthermore, it is the duty of this Court, so far as possible, to forecast the decision of the courts of the State of Washington. From the interpretation of these statutes, which are embedded in the reports,[19] it appears that the payment of Williamson would be held never to have entered the estate of Peterson company, but, if it did, the legal title thereto was held in trust to be paid to the Flohrs.
 
 
 20
 This Court has had difficulty in dealing with the payment by Williamson because the matter was decided upon motion for summary judgment. If the issues had been tried, there would have been no difficulty in ascertaining the facts relied upon by the trial court from the findings. But, as to that payment, no fact shown in the record militates against the holding of the trial judge. The Trustee had the burden of proving the elements of voidable preference.[20] Upon this feature, therefore, the trial judge was correct in determining there was no genuine issue as to a material fact.
 
 
 21
 As to the Favre account, it may be that there were sufficient bases[21] for the conclusion of the trial court under the state law. This Court is of opinion that there were genuine issues of material fact which could not be decided on summary judgment.[22]
 
 
 22
 The answer of defendants says the payment was made out of trust funds[23] in the hands of Peterson. This allegation is taken as denied. While it may be only a legal conclusion, yet we cannot clearly say the allegation is not one of ultimate fact. In interrogatories propounded to defendants by plaintiff, they were asked, in effect, "Where was this trust fund?" and defendants answered, "In Peterson's possession."
 
 
 23
 On the Favre account-payment by Peterson, in our view, the parties unwittingly, of course, misled the trial court into thinking the case was ready for summary judgment. But a case is not necessarily ready for summary judgment just because both sides move for it. It should be pointed out, in addition to the trust fund issue, at the moment of summary judgment there was still an issue left over the allegation of plaintiff that the questioned payment was such as to enable Flohr to obtain a greater percentage of the indebtedness due to defendants than any other creditor of the same class. This was denied. We think the facts on the Williamson check were sufficiently developed otherwise to permit a ruling, but we doubt it as to the Favre job payment.
 
 
 24
 It might be that, upon full development of the facts, it would be found that Favre paid traceable funds to Peterson upon a distinct understanding as to their disposition in payment of the lien upon property of Favre, or that the contractor was bound by his general contract to pay the lien, or facts might show that the payment by Peterson to the Flohrs was dictated by the applicable law or that Favre had made payments to the contractor with the implied intent that the latter should apply these generally.
 
 
 25
 Since the issues are remanded for trial, no solution of these is here suggested except as the principles above developed may be applicable to the facts found.
 
 
 26
 A substantial question briefed here involves statutory limitations. The trial court was of the opinion and ruled that the two year period of limitation provided by 11 U.S.C.A. § 29, sub. e, was applicable.
 
 
 27
 Defendants contended and now contend that the exercise of the right created by state statute was subject to the Washington limitation of six months from the date of application for the appointment of a receiver. We agree with the District Court that the matter is concluded by Schneidmiller v. Engstrom, 9 Cir., 177 F.2d 196, which affirms Engstrom v. DeVos, D. C., 81 F.Supp. 854.
 
 
 28
 The judgment of the trial court is affirmed as to the payment of $2,424.50. The judgment as to the payment of $730.00 will be vacated for proceedings not inconsistent with this opinion. Each party shall bear his own costs on appeal.
 
 
 
 Notes:
 
 
 [1]
 "The present case is brought under 70, sub. e, 11 U.S.C.A. § 110, sub. e, of the Bankruptcy Act and invokes state law and not federal law." Appellant's brief, pages 22-23
 
 
 [2]
 The only question is whether the payment by Williamson, the owner, to Flohr, the lienor, by a check made payable jointly to the bankrupt and Flohr, which was promptly endorsed by the bankrupt over to Flohr, was a "transfer made or suffered or obligation incurred by a debtor adjudged a bankrupt * * * which, under any * * * State law applicable thereto, is * * * voidable for any other reason by any creditor of the debtor * * *." Bankruptcy Act, § 70, sub. e (1), 11 U.S.C.A. § 110, sub. e (1)
 
 
 [3]
 Revised Code of Washington, §§ 23.48.010 (1) and (3), 23.48.030
 
 
 [4]
 R.C.W. §§ 60.04.010, 60.04.050; Laws of 1893, ch. 24, § 18
 
 
 [5]
 R.C.W. §§ 9.54.080, 9.54.080, 60.04.010, 60.04.110
 
 
 [6]
 "A material-man or laborer has a lien, notwithstanding payment to the contractor." Spokane Manufacturing & Lumber Co. v. McChesney, 1 Wash. 609, 21 P. 198
 
 
 [7]
 Nor would the appellant-trustee, standing in the stead of the bankrupt-contractor, have any claim against the Flohrs for money directly paid, because "It is well settled that payments by third parties of their own money do not constitute preferences." In re Zaferis Bros. & Co., 9 Cir., 67 F.2d 140, 141
 
 
 [8]
 "The first thought is that a payment cannot be a preference unless the debtor makes it, or someone makes it for the debtor, and out of his estate. In other words, a payment made by a third person with his own money cannot be the debtor's preference because it does not come from the debtor's estate, which necessarily remains of the same size after the payment as it was previously. Even if the person who makes the payment acquires thereby a right to reimbursement, that does not increase the debtor's liabilities, for the new claim replaces an old one that otherwise could have been asserted * * * The result is the same, in that the debtor's estate was not altered by the transaction, nor are the legal consequences different merely because B [the payor] chose to use the debtor as a trusted messenger." Garrard Glenn, Fraudulent Conveyances and Preferences, Revised Edition, Vol. Two, ch. XXII, § 403
 
 
 [9]
 "It is not the mere form or method of the transaction that the act condemns, but the appropriation by the insolvent debtor of a portion of his property to the payment of a creditor's claim, so that thereby the estate is depleted * * *." National Bank of Newport v. National Herkimer County Bank, 225 U.S. 178, 184, 32 S.Ct. 633, 635, 56 L.Ed. 1042. "Circuity of arrangement such as payment through a third person will not defeat the right of the trustee to set aside the preference if it is a transfer of the bankrupt's property * * *. But the funds transferred must be from the assets of the bankrupt and result in a diminution of the bankrupt's estate." Cheek v. Beverly-Wilshire Properties, Inc., D.C., 103 F.Supp. 913, 914. "What difference then does it make whether the checks were handed directly to the bank, or that they went through the form of having Adam indorse the insurance company's check, as well as Bert's own check which had been drawn payable to Adam? * * * The form is immaterial. Indeed, the very form employed quite conclusively indicates the intent of Bert and Adam to have it appear from the instrumentalities themselves that the funds originated with Bert and passed to the bank, for application on the note, without the purpose or the effect of the money coming, even momentarily, under Adam's actual control." First National Bank of Danville, Ill. v. Phalen, 7 Cir., 62 F.2d 21, 22, 88 A.L.R. 75. Although these cases directly involved the bankruptcy statute, which is not technically in issue here, the thoughts above expressed are no less relevant
 
 
 [10]
 "Every person * * * furnishing material to be used in the construction * * * of a * * * building * * * has a lien thereon for the labor performed or material furnished, whether performed or furnished at the instance of the owner or his agent * * *." R.C. W. § 60.04.010
 "The liens created by this chapter shall be preferred to any encumbrance which may attach after * * * the furnishing of the materials". R.C.W. § 60.04.050.
 
 
 [11]
 "`The provisions of law relating to liens created by this act, and all proceedings thereunder, shall be liberally construed with a view to effect their objects.'" R.C.W., Vol. 5, p. 4376, Laws of 1893, ch. 24, § 18
 
 
 [12]
 A casual reading of R.C.W. § 60.04.050 reveals that a lien created under that Act lodges and gains its preferential rights at the "commencement of the labor or the furnishing of the materials", and not later
 
 
 [13]
 "Every person, firm, or corporation furnishing materials * * * used in the construction * * * of any * * * building * * * shall, not later than five days after the date of the first delivery * * * to any contractor or agent, deliver or mail to the owner * * * notice in writing * * * stating * * * that such person, firm or corporation has commenced to deliver * * * and that a lien may be claimed * * *. No materialmen's lien shall be enforced unless the provisions of this section have been complied with." R.C.W. § 60.04.020
 
 
 [14]
 "No lien created by this chapter shall exist, and no action to enforce the same shall be maintained, unless within ninety days from the date of the cessation of the performance of such labor or of the furnishing of such materials, a claim for such lien shall be filed for record as hereinafter provided, in the office of the county auditor * * *." R.C.W. § 60.04.060(1)
 
 
 [15]
 "No lien created by this chapter binds the property subject to the lien for a longer period than eight calendar months after the claim was filed, unless an action is commenced within that time to enforce it * * *." R.C.W. § 60.04.100
 
 
 [16]
 "Now, it is not the contract for erecting or repairing the building which creates the lien, but it is the use of the materials furnished * * * that gives the material-man * * * his lien * * *." Van Stone v. Stillwell & Bierce Manufacturing Co., 142 U.S. 128, 12 S.Ct. 181, 183, 135 L.Ed. 961. "In most of the states * * * the actual use of the materials is not requisite if they are furnished for a particular building or improvement." Jones on Liens, Vol. 2, § 1329. "The lien attaches when the materials are delivered or the work commenced." Homann v. Huber, 38 Wash.2d 190, 193, 228 P.2d 466, 468. See Berger v. Baist, 165 Wash. 590, 602, 6 P.2d 412, 89 A.L.R. 164. See also Keene Guaranty Savings Bank v. Lawrence, 32 Wash. 572, 578, 73 P. 680, 682, wherein it is said: "* * * the date of the actual furnishing of the material governs the inception of the lien."
 
 
 [17]
 "* * * in those states where the fact of agency is the foundation of the lien statute, the corollary statute making the agent criminally liable for misappropriation is held valid, but where the lien statute creates no agency, and the creation of that agency is purely by a criminal act, the result logically follows that a criminal statute in such state would be held unconstitutional." 233 P. at page 287. Thus is the mechanic's lien law of Washington made distinct from that of California
 In applying the statutes of Washington pertaining to this statutorially created fiduciary relationship, the court said: "It provides that every one who shall come within the operation of the Mechanic's Lien Law, who shall receive payment on account of his contract, shall be deemed to receive it as the agent of the party with whom the contract was made, and for the purpose of paying the claims for which liens might be filed. * * * The contractors are not being punished for any indebtedness which they may owe their contractee, by reason of the receipt of the contract price or any part thereof, but they are being punished for their fraud, which is an altogether different matter." 233 P. at page 286.
 The Court expressly relies upon Pauly v. Keebler, 175 Wis. 428, 185 N.W. 554, 557, construing a statute which, like that of New York, places a trust on the contractor. It is said in that case: "When the contractor receives the money from the owner, he owes a duty to the third persons whose labor and materials have enabled him to obtain that money. * * * it refers to all persons who may be entitled to claim the benefit of the lien law * * *. Nor do we think the Legislature could have intended that the clause should be construed so strictly as to include only those who had actually filed the notice of lien at the time of the diversion of the trust fund."
 
 
 [18]
 The other federal statutes were inapplicable. At the time of filing of the petition in bankruptcy, there was no lien because it had been discharged by payment. Therefore, Section 67, sub. b, 11 U.S.C.A. § 107, sub. b, requiring a lien recognized thereunder to be "perfected," has no applicability. Section 1(28) of the Bankruptcy Act, 11 U.S. C.A. § 1(28), defining "Secured Creditor" to include one "who has security for his debt upon the property of the bankrupt" is not involved either. Flohrs are not claiming under this section, and the Trustee relies solely on the state preference statute
 
 
 [19]
 San Mateo Feed & Fuel Co. v. Hayward, 9 Cir., 149 F.2d 875, heavily relied upon, is triply inapplicable here. First, the case arose within four months of bankruptcy and was therefore governed by the provisions of that Act. Second, the decision necessarily involves a construction of the lien law of California, which is, as we have seen, different from that of Washington. Third, the case seems to overrule without mentioning two other cases previously decided by this Court. See Malott & Peterson v. Street, 9 Cir., 4 F.2d 770, and Street v. Pacific Indemnity Co., 9 Cir., 79 F.2d 68
 
 
 [20]
 The Trustee did not produce any proof that there was "a transfer of any of the property of such corporation [Peterson Bros.]" as required by R.C.W. § 23.48.010(3) and did not prove that "the effect of the enforcement of which [transfer] at the time it was * * * made" "would be to enable any one of the creditors of such corporation to obtain a greater percentage of his debt than any other creditor of the same class." There was no proof that any of the property of Peterson & Co. was transferred to pay off the lien of Flohrs. Even if this were proved, there still would be no proof that, "at the time" the transfer was made, a valid right enforceable in subrogation would not be acquired. There was no proof that any other creditor of Peterson & Co. was "in the same class" as the Flohrs
 
 
 [21]
 An exchange of values constitutes no preference. Even if the bankrupt did make the payment to Flohrs on the Favre account, he may have merely replaced his monetary assets thereby expended with a right of action against the owners for the same amount. His assets, although in different form, would then stand undiminished
 
 
 [22]
 Zig Zag Spring Co. v. Comfort Spring Corporation, D.C., 89 F.Supp. 410, 413; Griffeth v. Utah Power & Light Co., 9 Cir., 226 F.2d 661
 
 
 [23]
 "Transfer in obedience to specific equity; * * *. In the case of a recognizable equity, as where the debtor holds an asset upon an express trust, there can be no question as to the rights of the transferee. Neither a judgment creditor nor a trustee in bankruptcy has the status of a bona fide purchaser * * *. If, then, the creditor conforms to the terms of his trust without compulsion, the creditor cannot complain, nor is any grievance to be asserted by the trustee in bankruptcy." Garrard Glenn, Fraudulent Conveyances and Preferences, Revised Edition, Volume One, Ch. XVI(B), § 291(a)
 
 
 
 29
 BONE, Circuit Judge (dissenting).
 
 
 30
 I disagree with Judge FEE on several propositions of law expressed in his prevailing opinion and therefore dissent.