**Edward LIMPERIS, Trustee in the Matter of Morris Handler Co., Inc., Bankrupt, No. 71 B 4724, Plaintiff,**

v.

**MATERIAL SERVICE CORPORATION, a Foreign Corporation, Defendant.**

**No. 74 C 1211.**

United States District Court, N. D. Illinois, E. D.

March 18, 1976.

66

Ahern & Gillogly, Ltd., Chicago, Ill., for plaintiff.

Harry M. Coven, Howard M. Turner of Gould & Ratner, Chicago, Ill., for defendant.

## MEMORANDUM DECISION

MARSHALL, District Judge.

The plaintiff, Edward Limperis, trustee in bankruptcy for Morris Handler Company, Inc. (Handler), brought this action pursuant to Section 60(b) of the Bankruptcy Act, 11 U.S.C. § 96(b), to recover certain sums allegedly paid by or on behalf of Handler to Material Service Corporation (MSC) within the four month period preceding bankruptcy. The defendant has answered and moved for summary judgment asserting that the trustee has no claim to the funds.

Handler was engaged in the construction business. Sometime in 1969, Handler, as a contractor, entered into a written agreement with Tishman-Adams, Inc., a builder, to perform certain work on 222 South Riverside Plaza in Chicago, Illinois. The contract between Handler and Tishman-Adams provided that all liens of mechanics, materialmen, contractors or subcontractors for the furnishing of labor or materials were waived and released.

Thereafter, in January of 1971, pursuant to an oral agreement with Handler, MSC began delivering various materials for use in the 222 South Riverside Plaza project. Arthur Lindbloom, Jr., General Credit Manager of MSC, subsequently learned of the purported "no-lien" provision in the construction contract between Handler and Tishman-Adams, and after obtaining a copy of the contract between Handler and Tishman requested a meeting with representatives of Handler and Tishman-Adams in order to facilitate regular and timely payment for materials to be delivered to the jobsite. That meeting took place in February of 1971.

At the meeting, it was agreed that out of each monthly draw contemplated by the contract, a separate check would be issued by Tishman-Adams payable to the order of Handler for the purpose of paying for materials furnished by MSC. While the check was in the possession of Tishman-Adams, Handler would endorse the check payable to the order of MSC. Tishman-Adams would then notify MSC that it had a check ready to deliver, and MSC would pick up the check at Tishman's office.

MSC thereafter continued to ship materials to the jobsite from March through July of 1971. The alleged preferential payments were all made by checks prepared by Tishman-Adams, endorsed by Handler and delivered by Tishman-Adams to MSC. On August 11, 1971, Handler filed a petition in bankruptcy.

There appears to be no dispute between the parties as to the above facts. Disagreement arises, however, as to the consequences flowing from the method of making payments to MSC which was agreed upon by Tishman-Adams, Handler, and MSC. MSC alleges that if the money in question ever became the property of Handler, Handler held it only as trustee for the defendant and that therefore equitable title and beneficial use of the money never rested in Handler.

Paragraph 36 of the contract between Handler and Tishman-Adams states that:

> Any and all funds payable to the Contractor hereunder are hereby declared to constitute trust funds in the hands of the Contractor, to be applied first to the payment of claims of sub-contractors, architects, engineers, surveyors, laborers, and materialmen arising out of the described work, to claims for utilities furnished and taxes imposed, and to the payment of premiums on surety bonds and other bonds filed and premiums on insurance accruing during the construction of the described work, before application to any other purpose. Whenever required by the Builder, it shall be the duty of the Contractor to file with the Builder a verified statement, in form satisfactory to the Builder, certifying the amounts then due and owing from the said Contractor for labor and materials furnished under

the terms of this contract, setting forth therein the names of the persons whose charges or claims for labor, materials or supplies are unpaid, and the amount due to each respectively.

Prior to the time when MSC began supplying materials to the 222 South Riverside Plaza site, Handler had had the unrestricted use of all funds paid to it by Tishman-Adams, despite paragraph 36 of the contract, and despite the fact that another material supplier had been servicing the jobsite. Not until MSC came on the job was a material supplier treated as if it had a direct claim to monies being paid by Tishman-Adams to Handler. The fact of Handler's initial unrestricted use of the funds could be explained by hypothesizing that Handler as trustee violated the trust, or that the former material supplier as beneficiary simply chose not to enforce it. Or it could alternatively be explained by the existence of deficiencies in paragraph 36 sufficient to negate the existence of a trust.

■■■ There is no requirement that a trust of personal property be created by a written agreement. Such a trust may arise orally. *Catherwood v. Morris*, 345 Ill. 617, 178 N.E. 487 (1931); *Alexander v. Mermel*, 27 Ill.App.2d 281, 169 N.E.2d 569 (1960). However, the settlor must intend to create a trust, and the settlor must make evident the subject matter, the beneficiaries, the nature of the beneficiaries' interests, and the manner in which the trust is to be performed. *Golstein v. Handley*, 390 Ill. 118, 60 N.E.2d 851 (1959).

The manner in which the trustee is to carry out the trust discussed in paragraph 36 is not mentioned in the written contract. However, since a writing is unnecessary to create a trust of personal property, if the trust referred to in paragraph 36 was sufficiently amplified or if an entirely new and complete trust was created at the meeting in February of 1971, then a valid trust existed and Handler never had a beneficial interest in the checks paid to MSC.

■■■ The February, 1971 agreement entered into by Tishman-Adams, Handler, and MSC clearly contemplated that Handler was never to have any more than legal title to the checks issued by Tishman-Adams in the amount owing to MSC. Handler's obligation with respect to those checks was to endorse them over to MSC while they were in Tishman-Adams' possession. Handler never had the beneficial use of the checks, and indeed, never even removed them from Tishman-Adams' office. Such an arrangement shows that Handler was acting at most as trustee of the checks, not as the equitable owner of them. "Any agreement . . . made by a person having the power of disposal over property, whereby such person agrees or directs that a particular parcel of property or a certain fund shall be held or dealt with in a particular manner for the benefit of another, in a court of equity raises a trust in favor of such other person claiming under him, voluntarily or with notice." *Merchants Nat. Bank of Aurora v. Frazier*, 329 Ill.App. 191, 202, 67 N.E.2d 611, 617 (1946).

Two of the cases the plaintiff cites in opposition to the motion for summary judgment, *In Matter of Lord's Inc.*, 356 F.2d 456 (7th Cir. 1965), and *Kilgore v. State Bank of Colusa*, 372 Ill. 578, 25 N.E.2d 39 (1939), dealt with contracts that stated that certain funds were to be held in "trust." In each case the respective court found that no trust relationship was created, only a debtor-creditor relationship existed.

In the present case, no reliance need be put on the use of the word "trust" in paragraph 36 of the written contract, for the parties' agreement in February of 1971, and their subsequent actions plainly show the existence of a trust. Furthermore, difficulties which arise in determining whether this particular relationship between Handler and MSC was one of debtor-creditor or one of trust can be resolved by looking to whether there was a trust res, and if so, to what the trustee's duties were with regard to it. Bogert states the matter succinctly:

Frequently where insolvency of an obligor has intervened, it is important to determine whether he was a debtor out of whose estate a mere dividend can be

recovered, or a trustee from whose estate specific property can be taken. . . . In all of these cases the better reasoned decisions hold that if the obligor is to meet his obligation out of particular property he is probably intended to be a trustee of that property, but if he is to perform his duty by the use of any property in his hands which is convenient to him then he is probably intended to be under contract duties only. Bogert, *Law of Trusts*, § 27 (1973).

The relationship that existed between MSC and Handler was a trust relationship since Handler was to use specific property, namely the checks issued by Tishman-Adams in the amount owing to MSC in order to meet its obligations.

Two cases cited by the defendant lend further support to the conclusion that a trust should be declared to have existed with respect to the funds in question. In both *In Re H. G. Prizant and Co.*, 257 F.Supp. 145 (N.D.Ill.1965), and *Carrier Corp. v. J. E. Schecter*, 347 F.2d 153 (2d Cir. 1965), as in the case at hand, the debtor was to serve as a mere "conduit" of the funds to a particular material supplier or subcontractor. In *Prizant* the court held, "Where, as here, funds are turned over to a debtor for the *special purpose* of paying same to a third party to whom they are due, a court of equity is free to act to achieve the intended result." 257 F.Supp. at 147. In both *Prizant* and *Schecter* trusts were imposed.

Another basis alleged by the defendant in support of its motion for summary judgment is that not even legal title to the checks in question vested in Handler. The defendant states that title to the checks passed directly from Tishman-Adams to MSC. Two cases which lend credence to such an argument are *Keenan Pipe and Supply Co. v. Shields*, 241 F.2d 486 (9th Cir. 1956), and *Jackson v. Flohr*, 227 F.2d 607

(9th Cir. 1955), *cert. denied*, 350 U.S. 947, 77 S.Ct. 322, 100 L.Ed. 826. Each of those cases involved factual situations very similar to that existing as to Tishman-Adams, Handler, and MSC. The distinction between those two cases and the present one is that in the former two reliance was placed upon the fact that the material supplier or subcontractor had a right to file a lien under a state statute against the owner or principal contractor. That right served as consideration for the agreement by the principal contractor in *Keenan* to issue checks jointly to the subcontractor and material supplier which were then to be endorsed over to the material supplier solely. A similar right in *Flohr* prompted the owner to make checks payable jointly to the contractor and subcontractor to then be endorsed over by the contractor to the subcontractor.

If, in fact, the "no-lien" provision in the contract between Tishman-Adams and Handler was effective,[1] the defendant's case here would seem to be weaker than that of the defendants in *Keenan* and *Flohr*, because the possibility of imposition of a lien upon its property would not have served as motivation for Tishman-Adams to agree to a direct payment plan, and therefore consideration would have been lacking for such an agreement by Tishman. However, as the defendant suggests, Tishman-Adams may very well have been doubtful of the validity of the waiver of lien clause since MSC was not a party to the original contract.[2] Or, as both the plaintiff and defendant suggest, Tishman-Adams may have entered into such an agreement simply to ensure continued delivery of materials to the jobsite. Clearly there was reason for Tishman-Adams to want such a payment plan, since it wanted construction to continue.

Any such basis for Tishman-Adams' actions would have been proper under the written contract between Handler and

---

1. This issue is currently before the Illinois Appellate Court.

2. This theory is supported by the fact that an executive of MSC testified in an affidavit that

MSC delivered to Tishman-Adams a partial waiver of lien in the amount of each check paid to it at the time of delivery of the checks.

Tishman-Adams since paragraph 7(e) and (f) required Handler to indemnify the owner from the assertion of "liens, claims, demands, judgments or other liabilities" by other contractors and permitted the owner to "withhold from any payment due or thereafter to become due to the Contractor under the terms of this contract, an amount sufficient in its judgment to protect and indemnify it for any and all such claims. . . ."

Paragraph 35(b) of the contract further provided that:

The Builder may withhold payment to the Contractor on account of (1) the failure of the Contractor to comply fully with any requirement of this contract, including the failure of the Contractor to make payments to sub-contractors or for material or labor, (2) the failure of the Contractor to prevent the filing of claims or to avoid the reasonable probability of the filing of claims against the Builder, the project or the Contractor by reason of acts of the Contractor, and (3) damage to another Contractor.

Therefore, direct payments by Tishman-Adams to MSC would not have been in derogation of the rights of Handler.[3]

The court in *Flohr* stated that "The mere indorsement of the check did not pass the fund in the estate of Peterson Company. The making of the check to Peterson and the Flohrs jointly was simply to furnish evidence that the contractor knew of and acquiesced in the payment." 227 F.2d 610-611. Here, similarly, a strong argument can be made that the checks never became the property of Handler, and that therefore they cannot be recovered by the trustee.

■ The defendant raises two further arguments as foundation for its motion for summary judgment. The first claim is that MSC is a third-party beneficiary to the contract between Handler and Tishman-Adams, and that as such it had a right to the payments made to it. Reliance is placed upon *Avco Delta Corporation Canada Ltd. v. United States*, 484 F.2d 692 (7th Cir. 1973). The second argument is that the payments in question were not made for an antecedent debt, but were instead for new consideration which consisted of the making of additional deliveries to the jobsite. Both of these theories of the case appear to be of merit and they lend support to a decision against the plaintiff.

Summary judgment for the defendant is granted.

---

**3.** The plaintiff asserts that the provisions of the contract relating to a waiver of liens, a withholding of funds by the builder, and the setting up of a trust fund are contradictory and that furthermore, an issue of fact exists as to exactly which contractual basis for withholding the funds was intended by the parties. However, construction of a contract is a matter of law to be left to the court. 3 Corbin, *Corbin on Contracts*, Section 554 (1960); *Green v. Valve Corporation of America*, 428 F.2d 342 (7th Cir. 1970). And no real contradiction exists as all of the above-mentioned provisions are devices aimed at paying the debts owed to the material suppliers and protecting the builder from such claims. The contract provides several different bases upon which the builder could have withheld funds from the contractor in order to provide for the claims of the material supplier. It does not matter which basis was used, for the result that the contractor was not to have the beneficial use of the funds is the same under any of the contract provisions which would allow for withholding.